UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **SHEENA ROBERTSON** | **CASE NO. 6:17-CV-01663** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **IBERIA COMPREHENSIVE COMMUNITY HEALTH CENTER INC** | **MAGISTRATE JUDGE DAVID J. AYO** |

**MEMORANDUM RULING**

This is a medical malpractice action filed by Sheena Robertson ("Plaintiff" or "Robertson") against Dr. Danielle McLurkin ("McLurkin") and her employer, Iberia Comprehensive Community Health Clinic (the "Clinic"). The Clinic was deemed eligible for Federal Tort Claims Act coverage pursuant to the Federally Supported Health Centers Assistance Act ("FSHCAA"), 42 U.S.C. § 233(g)- (n), on June 27, 2014, and its deemed status has continued without interruption since that date. Since the Clinic is a federally-supported health facility of the Health Resources and Services Administration, the United States of America is the proper defendant in this matter. Robertson alleges that Dr. McLurkin, who was a family medicine specialist, failed to promptly diagnose Cauda Equina Syndrome ("CES"). Dr. McLurkin was one of several health care providers who saw plaintiff from April 30, 2015, through May 27, 2015. The other health care providers are defendants in Plaintiff's state action.

**I.
FINDINGS OF FACT**

1.  Plaintiff was a patient at the Clinic who presented for examination on May 26, 2015.[1] Her treating physician was McLurkin, who treated Plaintiff on May 26, 2015 in the course and

---

[1] Def. Ex. 1, pp. 001-004; Def. Ex. 3, pp. 008-010.

1

scope of her employment with the Clinic.[2] The diagnostic capabilities at the Clinic were limited. There was no X-ray machine, no EKG machine, no ultrasound machine, no MRI machine and no CAT scan machine. Labs could be drawn but had to be packaged up and sent out to LabCorp for processing and results.[3] Medicaid, Sheena Robertson's insurer, required that specialized imaging, such as the MRI at issue in this matter, be preapproved. Neither McLurkin, nor the Clinic, had the capability to simply send Plaintiff to a facility with an order in hand to get an MRI, or to set her up with an appointment to get same, without preapproval from Medicaid.[4]

2. There were no neurosurgeons in the area that accepted Medicaid for an outpatient consultation. In May of 2015, the only places that accepted Medicaid patients for outpatient consultations were LSU-Shreveport and LSU-New Orleans and there was a six month to one year waiting list for outpatient appointments.[5] Plaintiff had been a patient at the Clinic for years prior to May 26, 2015, starting with an initial visit on July 16, 2010.[6] Plaintiff had a history of noncompliance with recommendations made by doctors and staff at the Clinic.[7]

3. Over a 28-day period in 2015, which included the visit to the Clinic, Plaintiff presented to numerous medical settings complaining of back pain including the Clinic as well as the emergency departments at Our Lady of Lourdes Regional Medical Center and Dauterive Hospital. Initially, on April 30, 2015, Plaintiff presented to Our Lady of Lourdes Regional Medical Center ("OLLRMC") emergency room for "recurrence of pain radiating down the right lower extremity from the right lower back."[8] She was evaluated by Dr. Romig and

---

[2] ECF No. 8; Def. Ex. 3, pp. 008-010.
[3] Trial Transcript, p. 117, lines 16-25, p. 118, lines 1-15.
[4] Trial Transcript, p. 119, lines 11-25, p. 120, lines 1-15.
[5] Trial Transcript, p. 122, lines 13-22.
[6] Def. Ex. 3, pp. 002-054.
[7] Trial Transcript, p. 116, lines 16-25, p. 117, lines 1-8.
[8] Def. Ex. 5, pp. 08-09.

2

discharged with a diagnosis of sciatica and prescriptions for a muscle relaxant and analgesic.[9] Plaintiff returned to the OLLRMC emergency room on May 3, 2015, at which time her motor and sensory exams were normal.[10] Radiographs were obtained and read as normal alignment, normal disc spaces with no fractures noted.[11] Flexeril and Toradol were prescribed and the discharge diagnosis was low back pain and sciatica.[12]

4. On May 7, 2015, Plaintiff presented to the Clinic, where she saw McLurkin. Following an unremarkable exam, McLurkin diagnosed lumbar radiculopathy and prescribed an analgesic and muscle relaxant.[13] On May 23, 2015, Plaintiff went to the Dauterive Hospital emergency room. Plaintiff complained of bilateral lower back pain and numbness with posterior right knee pain, rated as severe. Plaintiff also complained of voiding frequency which is a urological finding.[14] The voiding frequency, 10/10 on pain scale and bilateral numbness were new findings.[15] The ER physician was concerned enough about her symptoms at this visit to consider, but did not order an MRI, and she was released.[16]

5. On May 25, 2015, Plaintiff returned, again, to the Dauterive Hospital emergency room with worsening symptoms. She complained of "spasms in both legs with numbness and pain." She also reported, "difficulty walking." No imaging studies were performed and, despite the worrisome symptoms consistent with nerve root compression, especially in light of pain

---

[9] Def. Ex. 5, pp. 016-019; Trial Transcript, p. 135, lines 3-18.
[10] Def. Ex. 5, p. 050.
[11] Def. Ex. 5, p. 034.
[12] Def. Ex. 5, p. 050; Trial Transcript, p. 135, lines 3-18.
[13] Def. Ex. 3, pp. 011-012; Trial Transcript, p. 135, lines 19-25, p. 136, lines 1-25, p. 137, lines 1-8.
[14] Def. Ex. 14, p. 60, lines 16-25; Def. Ex. 17, p. 40, lines 10-16.
[15] Def. Ex. 14, p. 60, lines 6-21; Def. Ex. 17, lines 3-22.
[16] Pl. Ex. 17, pp. 26-27; Def. Ex. 17, p. 40, lines 17-23.

3

and numbness in BOTH legs, yet, she was, again, diagnosed with back pain and discharged. Dauterive Hospital did not obtain an MRI or any other imaging study during this visit.[17]

6. On May 26, 2015, Plaintiff, as a walk-in patient, returned following multiple ER visits, for a follow-up with McLurkin at the Clinic. At that time, she detailed her two ER visits on May 23 and May 25, 2015 at Dauterive Hospital.[18] She signed a release for McLurkin to get records from Dauterive. She complained of continued back pain, difficulty walking, numbness in her buttocks and genital area and indicated that she could not feel herself urinating.[19] The Clinic did not have an MRI or CT scan machine onsite.[20] McLurkin examined Plaintiff, including examining her genital and rectal areas, and, given her evolving symptoms, ordered both a lumbar MRI and bilateral lower extremity EMGs.[21] These scans were contingent on insurance approval. Medicaid denied the MRI ordered.[22] Plaintiff testified that she recalled McLurkin telling her she was going to order an MRI. She also testified that she went to Lourdes ER after the MRI was denied, confirming McLurkin's testimony that she told her to go to an ER if her MRI was denied.[23]

7. On May 27, 2015, at 1:43 a.m., less than 17 hours after leaving the Clinic, Plaintiff called 911 and was transported to Dauterive Hospital. She complained of "muscle spasms in both legs, with numbness in her left perineal and groin area." She had diarrhea and urination but was unable to "feel" either effort.[24] She underwent a catheterization which drained 1200

---

[17] Def. Ex. 4, pp. 010-013; Def. Ex. 17, p. 44, lines 3-25, p. 45, lines 1-3, p. 98, lines 13-25, p. 99, lines 1-18, p. 100, lines 17-19.
[18] Trial Transcript, p. 137, lines 15- 25.
[19] Def. Ex. 3, p. 008; Trial Transcript, p. 137, lines 20-25, p. 138, lines 1-6.
[20] Trial Transcript, p. 117, lines 16-25, p. 118, lines 1-15.
[21] Def. Ex. 3, pp. 9-10, Trial Transcript, p. 139, lines 3-13.
[22] Def. Ex. 3, p. 007; Trial Transcript, p. 141, lines 24-25, p. 142, lines 1-5.
[23] Def. Ex. 3, p. 8; Trial Transcript, p. 11, lines 1-8; p. 74, lines 14-20.
[24] Def. Ex. 4, p. 14.

4

      ccs of urine from her bladder.[25] Plaintiff was diagnosed with a urinary tract infection and discharged.[26]

8. On May 27, 2015, at 6:36 p.m., twelve hours after being discharged from Dauterive Hospital, Plaintiff arrived by ambulance and was triaged at the ER at OLLRMC.[27] At this time, more than 2000 ccs of urine was drained from her bladder and a lumbar MRI was performed.[28] The ER physician documented Plaintiff as being neurologically intact noting specifically no lower extremity weakness.[29] The ER physician also indicated that no focal neurological deficits were observed.[30] Plaintiff was found to have a large L5-S1 herniation with complete canal blockage.[31] Plaintiff was seen the following morning by Dr. William Brennan, a neurosurgeon, who recommended prompt surgery.[32]

9. Plaintiff elected to delay this surgery until after she spoke to a relative. Consequently, Plaintiff's surgery did not begin until after 5 p.m. on May 28, 2015.[33] According to Dr. Brennan, Plaintiff likely already had developed a neurogenic bladder by the time she was seen by the Clinic on May 26, 2015.[34] A neurogenic bladder occurs when the person is no longer able to fully empty their bladder.[35] Plaintiff's own expert, Dr. Bertha Daniels agreed that Plaintiff did not develop a neurogenic bladder in the 18 hours between the time she left the clinic and the time she next presented to an ER at 2 a.m. on May 27, 2015.[36]

---

[25] Def. Ex. 4, p. 15.
[26] Def. Ex. 4, p. 16.
[27] Def. Ex. 5, p. 96.
[28] Def. Ex. 5, p. 91.
[29] *Id.*
[30] Def. Ex. 5, p. 092.
[31] Def. Ex. 5, p. 094.
[32] Def. Ex. 2, pp. 44-45.
[33] Def. Ex. 2, pp. 48-52; Def. Ex. 17, p. 56, lines 1-17; Trial Transcript, p. 74, lines 2-13.
[34] Def. Ex. 2, pp. 36-38.
[35] Def. Ex. 14, p. 023.
[36] Pl. Ex. 49, p. 39, lines 15-25.

## II.
## CONCLUSIONS OF LAW AND ANALYSIS

Under the Federal Tort claims Act[37] ("FTCA"), the United States is immune from suit except to the degree that sovereign immunity has been waived.[38] The FTCA waives sovereign immunity for personal injury caused by the negligence or wrongful act or omission of any employee of the government while acting within the scope of his or her duties, under circumstances where the United States, if a private person, would be liable in accordance with the substantive law of the place where the act or omission occurred.[39] State substantive law controls liability for medical malpractice under the FTCA.[40]

In a medical malpractice action such as the present action where a plaintiff alleges a failure in the standard of care, under Louisiana Medical Malpractice Act[41] ("MMA"), a plaintiff must prove the standard of care applicable, breach of the standard, and causation by a preponderance of the evidence. In a medical malpractice action against a physician who practices in a particular specialty, the plaintiff has the burden of proving (1) the degree of care ordinarily practiced by physicians in that specialty; (2) that the defendant either lacked this degree of skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and (3) that as a proximate result of the breach the plaintiff suffered injuries that would not otherwise have been incurred.[42]

Louisiana law makes clear, a physician who is not a specialist is to be held to the standard of care exercised by other physicians licensed to practice in this state who are actively practicing

---

[37] 28 U.S.C. 1346(B), 2671, et seq.
[38] *In re: Fema Trailer Formaldehyde Products Liability Litig.* 668 F. 3d 281, 287 (5th Cir. 2012)
[39] 28 U.S.C. 1346(b)(1), 2674; *Hanna v. the United States*, 523 F.3d 597, 601 (5th Cir. 2008)
[40] *Id.*; *Coleman v. U.S.*, 12 F 3d 824, 829 (5th Cir. 2019)
[41] La. R.S 40:1231.1, et seq.
[42] La. R.S. 9:2794(A); *Elliott v. Robinson*, 612 So.2d 996 (La. App. 2d Cir. 1993).

6

in a similar community under similar circumstances.[43] A physician is not required to exercise the highest degree of care possible, rather he must only exercise the degree of skill ordinarily employed by his peers under like circumstances, using reasonable care and his best judgment in performing the skill.[44] The mere fact that an injury occurred does not raise a presumption that the physician was negligent.[45] A physician's conduct and professional judgment must be evaluated in terms of the reasonableness under the existing circumstances and should not be viewed in hindsight and in terms of results or in light of subsequent events."[46]

As to the standard of care, according to Plaintiff's expert, Dr. Bertha Daniels, once CES is suspected, the standard requires the doctor to treat it as an emergency and immediately procure an MRI.[47] Dr. Kevin Barlotta also testified that the standard of care required ordering an emergent MRI.[48] Based on the facts established by the evidence, the Plaintiff has failed to prove that McLurkin and the Clinic deviated from the standard of care in their treatment of Ms. Robertson in this matter.[49] McLurkin examined Plaintiff on May 26, 2015 and ordered an MRI.[50] She properly and thoroughly assessed Plaintiff. She ordered an MRI and sought authorization for same. At the time the Plaintiff presented to the Clinic on May 26, 2015, she was already experiencing numbness and had issues with urination. Her bladder had become neurogenic over a period of days to weeks. McLurkin testified that, following her examination of the Plaintiff, she discussed the possibility of CES with Ms. Robertson and advised her that she needed and MRI immediately.[51] She advised Ms. Robertson that she needed to go to the emergency room right away and McLurkin started to

---

[43] La. R.S. 9:2794(A)(1).
[44] *Matthews v. La. State Univ. Med. Ctr. in Shreveport*, 467 So.2d 1238 (La. App. 2d Cir. 1985).
[45] La. R.S. 9:2794(C).
[46] *Gordon v. La. State Univ. Bd. of Supervisors*, 27,966 (La. App. 2d Cir. 03/01/96), 669 So.2d 736, 740.
[47] Pl. Ex. 49.
[48] Trial Transcript, p. 43, lines 23-25.
[49] Def. Ex. 14, p. 25.
[50] *Id.*
[51] Trial Transcript, p. 10, lines 17-25.

7

make arrangements to transport Ms. Robertson to the emergency room via ambulance.[52] However, Ms. Robertson refused to go to the emergency room based upon the fact that she had already visited the emergency room on several occasions during the preceding days.[53] Plaintiff presented no evidence to rebut McLurkin's testimony, which clearly established that McLurkin had made the appropriate diagnosis and ordered the appropriate diagnostic treatment. Plaintiff has failed to meet her burden of proving a breach of the standard of care.

In addition, Plaintiff has not proven that having the MRI performed any earlier than the evening of May 27, 2015 and scheduling the surgery any earlier than when it was done on May 28, 2015 would have made any difference in her outcome.[54] Thus, even if Plaintiff could establish that McLurkin and the Clinic failed to meet the standard of care, there is no evidence that any action taken or not taken by McLurkin was the proximate cause of Plaintiff's injuries.

Based upon the foregoing, the Court finds that Plaintiff has failed to meet her burden of proof regarding both a breach of the standard of care and causation. Accordingly, the Court finds in favor of Defendant on Plaintiff's claims. The parties are to submit a judgment within ten (10) days reflecting the Court's ruling.

THUS DONE in Chambers on this 13th day of September, 2023.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

---

[52] Trial Transcript, p. 11, lines 9-17.
[53] *Id.*
[54] Def. Ex. 14, p. 25; Pl. Ex. 50, p. 41, lines 11-25, p. 42, lines 1-2, p. 45, lines 13-16.

8